**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **MIKE GERALD SZABO,** | : | Case No. 3:13-CV-02485 |
| Plaintiff, | : | |
| v. | : | |
| **CAROLYN W. COLVIN,** | : | **MAGISTRATE'S REPORT AND** |
| Acting Commissioner of Social Security, | | **RECOMMENDATION** |
| | : | |
| Defendant. | : | |

## I. INTRODUCTION.

This case was automatically referred to the undersigned Magistrate Judge for report and recommendation pursuant to Local Civil Rule 72.2 for the United States District Court, Northern District of Ohio.  Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB)[1] made pursuant to Title II of the Social Security Act (Act) and Supplemental Security Income (SSI)[2] made pursuant to Title XVI of the Act.  Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 16).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

---

[1]    Eligibility for DIB benefits depends on the co-existence of two prerequisite conditions: disability and insured status.  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997).  A claimant must be disabled on or before the date his or her insured status expires.  *Id.*

[2]    The SSI program provides disability payments to the aged, blind, and disabled if they meet certain income eligibility standards.  42 U.S.C. §§ 1381–1383 (Thomson Reuters 2014).

## II. PROCEDURAL BACKGROUND.

Plaintiff completed applications for DIB and SSI on July 6, 2010, alleging that his disability began and he became unable to work on June 24, 2010 (Docket No. 13, pp. 164-165, 166-171 of 370).  Following the administrative denials upon initial review and reconsideration (Docket No. 13, pp. 97-99, 100-102, 105-107, 109-110 of 370), Plaintiff requested a hearing (Docket No. 13, pp. 118-119 of 370).  On July 25, 2012, Administrative Law Judge (ALJ) Richard E. Guida conducted a video hearing at which Plaintiff, represented by counsel, and Karen Van Dyke, a Vocational Expert (VE) for the Social Security Administration (SSA), appeared and testified (Docket No. 13, pp. 33, 127-128 of 370).  ALJ Guida rendered an unfavorable decision on August 3, 2012 (Docket No. 13, pp. 16-27 of 370), and on October 10, 2013, the Appeals Council denied Plaintiff's request for review (Docket No. 13, pp. 5-7 of 370).  Plaintiff filed a timely Complaint in the United States District Court for the Northern District of Ohio to challenge the denial of benefits (Docket No. 1).

## III. FACTUAL BACKGROUND.

The following is a summary of the testimony presented by Plaintiff and the VE at the administrative hearing (Docket No. 13, pp. 36-45, 46-53 of 370).

### A. PLAINTIFF'S TESTIMONY.

Plaintiff was 6'1" tall and weighed 281 pounds. He had obtained a general equivalency degree (GED).  He resided in his mother-in-law's  two-story home with her, his wife and stepson.  Having not worked since 2009, Plaintiff relied upon his wife to pay monthly expenses.  Plaintiff admitted that he reduced his smoking to less than a pack daily after being advised by his neurosurgeon to stop smoking completely (Docket No. 13, pp. 37-38, 39, 44, 45 of 370).

Plaintiff was employed for nine years at the Arrow True Line as a shipper.  When the

2

economy declined, he was laid off (Docket No. 13, pp. 36-37 of 370).  Plaintiff was last employed

for two weeks at an injection molding company where he sustained back and neck injuries.  After this

injury, he quit working (Docket No. 13, p. 37 of 370).

Plaintiff was a non-insulin dependent diabetic and he denied having adverse effects from his

diabetes (Docket No. 13, p. 39 of 370).  Consequently, his claims for disability were limited to his

back and neck issues.  He attributed his back pain to the heavy lifting required when he worked as

a shipper.  Since he was not a likely candidate for surgery, Plaintiff received a conservative course

of treatment which included medications and therapy, both physical and occupational,  to relieve his

symptoms and improve physical functioning.  A side effect of the drug therapy was fatigue and

sleepiness.  Plaintiff lost 20 pounds when the neurosurgeon suggested that there was a 50% chance

of reduced back pain with weight loss (Docket No. 13, pp. 38, 39, 42, 44 of 370).

During a typical day, Plaintiff made coffee for his wife, prepared his own meals, watched

several hours of television, spent up to ninety minutes playing games on the computer and relaxed

on the bed to relieve his back pain.  Plaintiff drove his wife to the store and to visit family (Docket

No. 13, pp. 40, 41 of 370).  His weekends were spent "hanging out" with his wife.  Plaintiff estimated

that he dined out twice a month and he recalled that the last vacation he took was eight years prior

to the hearing (Docket No. 13, p. 42 of 370).

     **B.**    **THE VE TESTIMONY**.

The VE reviewed the record and stated that her testimony was consistent with the information

contained in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a United States Department of Labor

publication that organizes jobs in the United States economy based on their similarities and defines

the structure and content for performance of all listed occupations (Docket No. 13, p. 50; 1991 WL

654964 (4th ed. 1991)).  The VE proceeded to classify Plaintiff's past relevant work by (1) job title, (2) skill requirements, (3) the level of physical exertion; and (4) specific vocational preparation (SVP), an estimate of the amount of lapsed time a typical worker could learn the techniques, acquire the information and develop the facility for average performance of the listed jobs:

| (1) POSITION AND DOT REFERENCE | (2) SKILL LEVEL | (3) LEVEL OF PHYSICAL EXERTION | (4) SVP |
|---|---|---|---|
| Material handler 929.687-030 | Semiskilled work is work which needs some skills but does not require doing the more complex work duties; such jobs may require alertness and close attention, coordination and dexterity as when hands or feet must be moved quickly to do repetitive tasks.  20 C.F.R. §§ 404.1568, 416.968. | Heavy level of exertion involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. 20 C.F.R. §§ 404.1567(d), 416.967(d). | 3--over one month up to and including three months. Www.onetonline.org. |
| Truck driver 905.663-014 | Semiskilled | Medium level of exertion | 4–over three months up to and including six months. |
| Trial injection molder 556.382-014 | | Medium level of exertion | 5–over six months and up to and including one year. |

(Docket No. 13, p. 46 of 370).

The ALJ posed the *first* hypothetical:

Consider a hypothetical individual with Plaintiff's age, education and work background.  Assume that the hypothetical individual can perform work at the light exertional level, occasional postural movements except never climb using ladders, ropes and scaffolds.  Could such an individual perform any of Plaintiff's past work?

The VE opined that based on this hypothetical, the individual could not perform any of Plaintiff's past work.  However, in Toledo, Ohio and the United States of America, there were jobs representative of light work that the hypothetical individual could learn and develop the facility to perform in up to one month after a short demonstration, as follows:

| POSITIONS | TOLEDO, OHIO | UNITED STATES OF AMERICA |
|---|---|---|
| Cashier DOT 211.462-010 | 8,500 | 3,545,000 |

| Sales attendant<br>DOT 299.677-010 | 8,550 | 4,426,000 |
| Retail price marker<br>DOT 209.587-034 | 4,000 | 1,873,000 |

(Docket No. 13, p. 47 of 370).

The ALJ posed the *second* hypothetical that had the same limitations as the first except that the hypothetical individual would exceed normal tolerances for absences exceeding 12 days annually or roughly one day per month and two, 15-minute breaks per day in addition to a 90-minute lunch break.  Employers typically have no tolerance for being off task in addition to the taking up to two hours daily in breaks from working (Docket No. 13, pp. 47-48 of 380).

Counsel posed a *third* hypothetical:

. . . . the hypothetical person had the same qualifications as hypothetical number one, except that this individual was relegated to a sit/stand option. Would there be jobs that were eliminated or reduced?

The VE explained that the sales attendant job would not accommodate the sit/stand option and the cashier and retail price marker positions would accommodate a sit/stand option (Docket No. 13, p. 50 of 370).

### IV.  MEDICAL EVIDENCE.

Dr. Samer S. Obri, M.D., an internal medicine specialist, monitored  Plaintiff's compliance with the medication regimen used to treat diabetes, hypertension and hyperlipidemia.  On April 22, 2009, he recommended that Plaintiff quit smoking, refilled his prescriptions and ordered diagnostic tests (Docket No. 13, p. 278 of 370; www.healthgrades.com/physician/dr-samer-obri).

On July 25, 2009, Dr. Samer observed that Plaintiff's diabetes was better controlled and he refilled the prescriptions.  In consideration of Plaintiff's limited financial resources, Dr. Obri switched his medication used to treat acid reflux to a generic brand (Docket No. 13, p. 277 of 370).

5

In October 2009, Dr. Obri noted that Plaintiff had been on Plavix, a blood thinner, for more than a year and he stressed the need to continue taking the drug with an aspirin regimen.  Plaintiff's drug regimen was supplemented with medication typically used to treat pain, stiffness and muscle spasm (Docket No. 13, p. 276 of 370; www.drugs.com/plavix.html).

Dr. Obri ordered diagnostic testing of the left and right common arteries in Plaintiff's head, and neck.  Results from the first computed tomography (CT) scan administered on October 25, 2009,were unremarkable (Docket No. 13, pp. 241-242 of 370).  Results from the second CT scan administered on October 26, 2009, showed microvascular ischemic changes in the penventricular white matter (Docket No. 13, p. 240 of 370).  Results from a Doppler study administered on October 27, 2009, were equally unremarkable.  There was no evidence of significant stenosis at the carotid artery or evidence of dissection (Docket No. 13, pp. 238-239 of 370).

When renewing Plaintiff' s prescriptions on October 29, 2009, Dr. Obri urged Plaintiff to stop smoking,  modify his diet and  exercise (Docket No. 13, p. 276 of 370).

On December 8, 2009, Dr. Obri was unable to confirm his suspicion that Plaintiff had a frozen shoulder with magnetic resonance imaging testing because Plaintiff was fearful of being in a closed space.  Dr. Obri developed a medication protocol to manage Plaintiff's shoulder pain (Docket No. 13, p. 275 of 370).

On December 9, 2009, Plaintiff underwent a CT scan of the spine to ascertain the source of his neck pain.  The results were:

1.   Moderate narrowing of the left neural foramen at C2-C3.
2.   Moderate narrowing of the spinal canal, moderate narrowing of the right neural foramen, and mild narrowing of the left neural foramen at C3-C4.
3.   Moderate narrowing of the spinal canal. Severe narrowing of the left neural foramen

6

and moderate narrowing of the right neural foramen at C4-C5 .

4.    Moderate narrowing of the spinal canal and severe bilateral narrowing of the neural foramina at C5-C6 (Docket No. 13, pp. 303-304 of 370).

Dr. Obri noted on December 15, 2009, that Plaintiff refused to go to physical therapy and Plaintiff showed no interest in obtaining a neurological consultation.  Dr. Obri provided a template of stretching exercises, imposed lifting restrictions and continued the medication regimen (Docket No. 13, p. 274 of 370).

On January 30, 2010, Dr. Obri treated Plaintiff for conjunctivitis of the right eye.  Plaintiff's blood pressure "was good."  Dr. Obri continued to recommend lifestyle changes particularly to control Plaintiff's glucose levels (Docket No. 13, p. 273 of 370).

Plaintiff was referred to Neurosurgical Network for consultation and on March 31, 2010, Dr. Patrick W. McCormick, M.D., a neurologist, performed a comprehensive review of Plaintiff's health history, systems, family history and personal history.  Plans were made to get a definitive diagnostic study (Docket No. 13, pp. 258-260 of 370).  After undergoing the tests, Dr. McCormick conducted the actual consultative examination on May 12, 2010.  Here, he reviewed Plaintiff's imaging studies and shared with Plaintiff, the following conclusions:

1.    The plain cervical spine films did not demonstrate evidence of instability.  Rather, they showed multi-segmental degenerative changes.
2.    The lumbar flexion/extension spine films showed significant spondylolisthesis and spondylolysis at L5-S1 with complete collapse of disc space.
3.    The myelogram and post-myelogram CT scan showed segmental mild stenosis at multiple levels.
4.    The myelogram and post-myelogram CT scan showed that there was a narrowing affecting the L5 root bilaterally and spondylolytic defects.  There was basically bone on bone to the extent that there was probably a spontaneous fibrous union at this level.

In the end, Dr. McCormick recommended that:

1.    Plaintiff would be able to perform a higher amount of activity with fewer restrictions if he lost weight.

7

2.      Plaintiff quit smoking as it could be a risk factor in future surgeries.  The combination of obesity and smoking would certainly affect Plaintiff's pain and improvement (Docket No. 13, pp. 256-257 of 370).

Dr. Obri again checked  Plaintiff's conditions on May 17, 2010, this time adding Mobic, a non-steroidal anti-inflammatory drug, to the regimen (Docket No. 13, p. 272 of 370; www.drugs.com/Mobic.html).

During June 2010, Plaintiff saw Dr. Obri four times.  On June 3, Dr. Obri referred Plaintiff to physical and occupational therapies for evaluations (Docket No. 13, p. 271 of 370).  On June 10, Dr. Obri administered an epidural steroid injection.  On June 24, Dr. Obri continued prescriptions for Mobic and Zanaflex, a short-acting muscle relaxer.  On June 27, Plaintiff complained that his neck pain was now radiating to his arm and Dr. Obri added to his drug regimen, Lyrica, a pain medication used to treat nerve and muscle pain caused by diabetes or spinal cord injury (Docket No. 13, pp. 269, 270, 301-302 of 370; www.drugs.com/Zanaflex.html; www.drugs.com/Lyrica.html)).

Plaintiff complained on August 24, 2010, that the epidural injection had been ineffective and the physical therapy had aggravated his pain.  Dr. Obri referred Plaintiff to pain management (Docket No. 13, p. 268 of 370).

Dr. Obri treated Plaintiff for acute bronchitis on September 21, 2010 (Docket No. 13, p. 267 of 370).

On October 21, 2010, Dr. Obri refilled his prescriptions and stressed the need for lifestyle changes.  Plaintiff's diabetes was uncontrolled so Dr. Obri prescribed a medication that required a subcutaneous injection in the abdomen daily (Docket No. 13, p. 266 of 370).

On November 18, 2010, Dr. Obri supplemented Plaintiff's drug regimen with Victoza, a medication used in conjunction with exercise and diet to control blood glucose levels (Docket No.

13, p. 313 of 370; www.drugs.com/Antivert.html).

On February 18, 2011, Plaintiff had not been medication compliant for some time but he had lost weight and reduced the number of cigarettes smoked.  To promote walking and further weight loss, Dr. Obri refused to issue Plaintiff a certification for a prescription needed to obtain a disability placard (Docket No. 13, p. 314 of 370).

By May 18, 2011, Plaintiff had quit smoking and gained 7 pounds.  Plaintiff complained of occasional dizziness, sneezing and earache.  Dr. Obri prescribed Antivert, an antihistamine (Docket No. 13, p. 315 of 370; www.drugs.com/Antivert.html).

With an antibiotic and pain reliever, Dr. Obri treated Plaintiff's toothache on August 4, 2011 and referred Plaintiff to a dentist (Docket No. 13, p. 316 of 370).  On August 18, 2011, Dr. Obri refilled Plaintiff's medications and restarted him on Zanaflex because his pain was not well-controlled (Docket No. 13, p. 317 of 370).

On October 10, 2011, Dr. Obri performed an electrocardiogram (EKG) in his office when Plaintiff presented with atypical chest pain that radiated in between his shoulder blades.  Although the results from the EKG were normal, Dr. Obri admitted Plaintiff to the Defiance Regional Medical Center directly from his office for further evaluation (Docket No. 13, pp. 318, 319-320 of 370).  Results from the CT scan showed a calcified nodule in the lateral basal segment of the right lung lower lobe and mild thickening of the wall of the bronchi (Docket No. 13, p. 360 of 370).

On October 15, 2011, Dr. Obri reviewed the procedure for Plaintiff's upcoming stress test.  He reiterated his earlier advice that Plaintiff lose weight, stop smoking  and start a regular exercise program (Docket No. 13, p. 321 of 370).

A stress test used for people who cannot walk on a treadmill was administered on October 20,

9

2011.  The results showed no electrodiagnostic changes suggestive of myocardial ischemia, normal left ventricular ejection fraction and moderately severe inferior wall hypokinesis consistent with infarct.  In addition, it showed a(n):

1.  Inferior wall "hypomotility and hypoactivity" fixed between stress and rest imaging consistent with an inferior wall infarct.
2.  Small zone of moderate to moderately severe inferoseptal ischemia adjacent to the infarct.
3.  Small amount of mild to moderate marginal ischemia at the lateral aspect of the inferior wall (Docket No. 13, pp. 357, 358-359 of 370).

After undergoing the stress test and heart catheterization, Dr. Obri stressed that given the diffuse irregularities and 40% stenosis, Plaintiff should stop smoking.  Plaintiff had been switched to beta blocker therapy and Dr. Obri increased Plaintiff's aspirin therapy and switched his medication regimen so that all medications were compatible (Docket No. 13, p. 322 of 370).

Plaintiff underwent a comprehensive physical examination on January 30, 2012, and his medication regimen was modified to treat diabetes, hypertension, hyperlipidemia and hepatic disease (Docket No. 13, pp. 324-326 of 370).

On March 27, 2012, Plaintiff presented for a medication recheck.  All of the previous advice regarding smoking, diet and exercise was repeated and his medication was continued.  Plaintiff refused an offer of insulin (Docket No. 13, pp. 330-331 of 370).

During his 4-week follow-up appointment on April 24, 2012, the medication regimen was continued.  Dr. Obri introduced some exercises designed to reduce lower back pain (Docket No. 13, p. 335 of 370).

On June 25, 2012, Dr. Obri completed a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY form with input from Plaintiff regarding his assessment of his own impairments.  The resulting conclusions are:

1.     Plaintiff could walk one city block without rest or severe pain.
2.     Plaintiff could sit at one time for 15 minutes.
3.     Plaintiff could stand at one time for 15 minutes.
4.     Plaintiff could sit and stand/walk less than two hours in an 8-hour workday.
5.     Plaintiff must walk 60 minutes in an 8-hour workday, 10 minutes at a time.
6.     Plaintiff could lift and/or carry less than 10 pounds rarely.
7.     Plaintiff could rarely look down and occasionally turn his head to the right or left, look up and hold his head in a static position.
8.     Plaintiff could rarely twist, stoop, crouch, climb ladders and climb stairs.
9.     Plaintiff had significant limitations with reaching, handling or fingering.
10.    Plaintiff was unable to work at this time.
11.    Plaintiff's impairments were expected to last at least 12 months and he was not a malingerer (Docket No. 13, pp. 364-368, 370 of 370).

## V. LEGAL FRAMEWORK FOR EVALUATING DISABILITY CLAIMS.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)). The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical. *Id.*

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6th Cir. 2010).

First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application. *Id.* (*citing* 20 C.F.R. § 404.1520(b)). Second, the claimant must show that he or she suffers from a severe impairment. *Id.* (*citing* 20 C.F.R. § 404.1520(c)). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment,

11

he or she will be considered disabled without regard to age, education, and work experience. *Id.* (*citing* 20 C.F.R. § 404.1520(d)).  Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional capacity (RFC) and relevant past work to determine if he or she can do past work; if so, he or she is not disabled.  *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6th Cir.2002)).  If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work.  *Id.*  If the claimant cannot perform other work, the Commissioner will find him or her disabled.  *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

### VII.  THE ALJ'S DECISION.

Upon careful consideration of the entire record, ALJ Jordan made the following findings:

1.    Plaintiff met the insured status requirements of the Act through March 31, 2014 and he had not engaged in substantial gainful activity since June 24, 2010, the alleged onset date.

2.    Plaintiff had the following severe impairments:

        a.    Degenerative disc disease.
        b.    Diabetes mellitus.
        c.    Heart disease.
        d.    Obesity.

3.    Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part. 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity to perform light work except that he could never climb ladders, ropes or scaffolds and could only occasionally balance, stoop, kneel, crouch, crawl or climb ramps and stairs.

5.    Plaintiff was unable to perform any past relevant work.

6.    Plaintiff was an individual closely approaching advanced age, had at least a high school education and was able to communicate in English.  Given Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

12

7.      Plaintiff had not been under a disability as defined in the Act from June 24, 2010 through the date of the decision on August 3, 2012 (Docket No. 13, pp. 19-27 of 370).

## VIII.  THE LEGAL FRAMEWORK FOR JUDICIAL REVIEW.

In a social security appeal, the Court's inquiry is limited to determining whether the ALJ's non-disability finding is supported by substantial evidence. *Roberts v. Commissioner of Social Security*, 2014 WL 1123564, *1 (S.D.Ohio,2014) (*citing* 42 U.S.C. § 1383(c)(3); *Bowen v. Commissioner of Social Security*, 478 F.3d 742,745–46 (6th Cir.2007)).  Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.* (*citing Richardson, supra*, at 1420; *Ellis v. Schweicker*, 739 F.2d 245, 248 (6th Cir.1984)).  Substantial evidence is more than a mere scintilla, *Id.* (*citing Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988); *NLRB v. Columbian Enameling and Stamping Company*, 59 S.Ct. 501, 505 (1939), rather, substantial evidence must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.  *Id.* (*citing LeMaster v. Secretary of Health and Human Services*, 802 F.2d 839, 840 (6th Cir.1986) (*quoting NLRB, supra*).

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Id.* (*citing Hephner v. Mathews*, 574 F.2d 359 (6th Cir.1978); *Ellis, supra*; *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536 (6th Cir.1981); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir.1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir.1984)).  The Court may not try the case de novo, resolve conflicts in evidence or decide questions of credibility.  *Id.* (*citing Garner, supra*).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the Court as a trier of fact would have arrived at a different conclusion.  *Id.* (*citing Elkins v. Secretary of Health and Human*

13

*Services*, 658 F.2d 437, 439 (6th Cir.1981)).

## IX. ANALYSIS.

Plaintiff argues that the ALJ:

(1)    failed to give controlling weight to the treating physician opinions.
(2)    failed to apply SSR 82-59.
(3)    failed to make a decision that is consistent with other governmental agencies that
       found Plaintiff disabled.

## 1.    THE TREATING SOURCE.

Plaintiff alleges that the ALJ failed to regard Dr. Obri as a treating source and alternately

failed to show good cause for failing to give controlling weight to his opinions.

### A.    THE TREATING PHYSICIAN RULE AND THE GOOD REASONS REQUIREMENT.

The Commissioner has elected to impose certain standards on the treatment of medical source

evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1502). Under one

such standard, commonly called the treating physician rule, the Commissioner has mandated that the

ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in your case record." *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If the ALJ

declines to give a treating source's opinion controlling weight, he or she must then balance the

following factors to determine what weight to give it: "the length of the treatment relationship and

the frequency of examination, the nature and extent of the treatment relationship, supportability of

the opinion, consistency of the opinion with the record as a whole, and specialization of the treating

source." *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir.2004)

(*citing* 20 C.F.R. § 404.1527(d)(2)).

Importantly, the Commissioner imposes on its decision makers a clear duty to always give

14

good reasons in the decision for the weight given a treating source's opinion.  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.* (*citing* Soc. Sec. Rul. No. 96–2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)).  This requirement is not simply a formality; rather, it is to safeguard the claimant's procedural rights.  *Id.*  It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his or her physician has deemed him or her disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he or she is not disabled.  *Id.* at 937-938 (*citing Wilson*, *supra*, 378 F.3d at 544).  This requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule."  *Id.* (*citing Wilson, supra*, 378 F.3d at 544–45).

## B.  RESOLUTION.

The ALJ followed the treating physician rule, attributing substantial deference to Dr. Obri's opinions on Plaintiff's impairments, treatments and responses to degenerative disc disease, obesity, diabetes mellitus and heart disease (Docket No. 13, pp. 24-25 of 370).  The ALJ was free to reject that portion of Dr. Obri's opinion regarding Plaintiff's functional limitations because such conclusions were not only inconsistent with the medical record as a whole, they were unreasonable given the clinical and diagnostic evidence resulting from Dr. Obri's course of treatment.

The ALJ identified the regulatory directives required for meaningful review of opinion evidence.  Enumerating the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c), he adequately supported his conclusion to discount Dr. Obri's medical opinion to the extent that it exceeded the

standards of clinical decision making and was inconsistent with the medical record as a whole.  The ALJ's explanation is brief but he did consider what weight to attribute to Dr. Obri's opinions, acknowledging that Plaintiff had a long-term relationship with Dr. Obri, an internist (Docket No. 13, pp. 25, 25 of 370); that Dr. Obri had a special knowledge about Plaintiff's impairments, having referred him to independent specialists and laboratories for tests and obtained the results from these tests (Docket No. 13, pp. 23, 24 of 370); and that medical signs and laboratory findings supported his opinions (Docket No. 13, p. 25 of 370).

The ALJ was compelled to discount Dr. Obri's assessment of Plaintiff's functional limitations which were in conflict with the objective medical evidence.  Within the context of the ALJ's decision, the Magistrate finds at least four reasons that explain why the ALJ legitimately rejected Dr. Obri's functional limitations assessment.

First, Dr. Obri determined that Plaintiff had severe functional limitations and he was therefore disabled.  Dr. Obri's functional limitation findings go beyond the ultimate question of disability and infringe upon the Commissioner's discretion to determine disability.

Second, while Dr. Obri's refusal to complete the application for a disability placard is not dispositive of functional limitations and/or disability under the Act, his refusal does have evidentiary value.  Dr. Obri's determination denying the placard suggests that its issuance would be counterproductive to the exercise regimen that he had been encouraging for years and that there was no neurological or orthopedic impediment to Plaintiff's walking, standing or using his hands.

Third, the evidence on which Dr. Obri relies that raises the severity of Plaintiff's functional impairments to the level he proposes, is based in large part on Plaintiff's subjective reports.  In this case, the method for assessing Plaintiff's functional limitations included Plaintiff's own assessment

16

of his exertional limitations as  Dr. Obri solicited Plaintiff's input while completing the PHYSICAL

RESIDUAL FUNCTIONAL CAPACITY form

Fourth, there is a disconnect between Dr. Obri's observations and his functional limitations

assessment.  For instance, he observed that Plaintiff had a normal gait and no mobility limitations or

muscle spasms.  Yet in the residual functional capacity assessment, he opined that Plaintiff could only

walk one city block without rest or severe pain, sit at one time for 15 minutes and stand at one time

for 15 minutes (Docket No. 13, pp. 24-25 of 370).

The ALJ attributed significant weight to Dr. Obri's opinions which were supported by the

evidence and otherwise consistent with the record.  On the other hand, he gave less weight to Dr.

Obri's opinions that were unsubstantiated in substance.  The Magistrate finds no error in the ALJ's

evaluation of Dr. Obri's opinions.

### 2.    FAILURE TO FOLLOW THE PRESCRIBED TREATMENT.

Plaintiff requests a remand because the ALJ failed to adequately follow the Program Policy

Statement, FAILURE TO FOLLOW PRESCRIBED TREATMENT, SSR 82-59, 1982 WL 31384 (1982), a

regulation that outlines the conditions that must be met before the SSA may determine that an

individual has failed to follow prescribed treatment and thus is not under a disability for purposes of

the Act.  This argument lacks merit ast SSR 82-59 is not applicable to the instant case.

### A.    SSR 82-59.

SSR 82–59, codified at 20 C.F.R. §§ 404.1530 and 416.930, provides that a claimant who is

found to have a disability under the five-step analysis above, but who does not follow treatment

prescribed by his or her physician that can restore her ability to work, must have a good reason for

not following that treatment in order to be found disabled:

An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the SSA determines can be expected to restore the individual's ability to work, cannot be [sic] virtue of such "failure" be found to be under a disability.

*Williams v. Commissioner, Social Security Administration*, 2014 WL 1406433, *12 (N.D.Ohio,2014) (*citing* SSR 82–59, 45 Fed.Reg. 55566 (Aug. 20, 1980) (emphasis added)).  Failure to follow prescribed treatment becomes determinative only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore his or her ability to work.  *Id.* (*citing Hester v. Secretary of Health & Human Services,* 886 F.2d 1315, 1989 WL 115632, *3 (6th Cir.1989); *see also* 20 C.F.R. §§ 404.1530, 416.930 (2012)).  In other words, SSR 8–59 only applies to claimants who would otherwise be disabled within the meaning of the Act; it does not restrict the use of evidence of noncompliance for the disability hearing."  *Id.* (*citing Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001)).

## B.  RESOLUTION.

The ALJ correctly considered Plaintiff's noncompliance with the medication regimen and recommended lifestyle choices in assessing Plaintiff's credibility as well as the severity of his subjective symptoms.  Analysis under the provisions of SSR 82-59 was never triggered because there was no prior ALJ finding that Plaintiff was disabled and he would not have been disabled had he followed treatment recommendations.  The Magistrate finds no error in the ALJ's failure to evaluate Plaintiff's case under SSR 82-59 as the regulation is inapplicable.

18

3.    **DISABLING PAIN ANALYSIS.**

Plaintiff claims that the ALJ improperly discounted his subjective complaints of pain under 20 C.F.R. §§ 404.1529 and 416.929.

A.    **THE LAW**.

Social Security regulations require a two-pronged evaluation of subjective complaints of disabling pain. *Shaw v. Commissioner of Social Security Administration*, 2013 WL 4784563, *3 (N.D.Ohio,2013) (*citing* 20 C.F.R. § 404.1529(c); *Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir.1994)). First, the ALJ must determine whether there is objective medical evidence of an underlying medical condition that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 404.1529(c). Second, if the ALJ finds that an underlying impairment exists, he must evaluate the intensity, persistence, and limiting effects of the symptoms on the claimant's ability to work. *Id*. In evaluating the claimant's symptoms, the ALJ should consider the following factors:

(1)    the claimant's daily activities and functional restrictions.
(2)    the nature, location, duration, frequency and intensity of the claimant's symptoms.
(3)    any precipitating or aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms.
(4)    treatment, other than medication, the claimant receives to relieve the pain;
(5)    measures used by the claimant to relieve the symptoms.
(6)    statements from the claimant and the claimant's treating and examining physicians. *Id*. (*citing Felisky*, 35 F.3d at 1039–40; SSR 96–7p, 1996 WL 374186, at *3).

B.    **RESOLUTION**.

The ALJ failed to precisely reference the relevant sections or factors to be applied under Section 404.1529 or 416.929. He did, however, recognize that it was his responsibility to consider Plaintiff's complaints of pain, any objective evidence of its origin, its intensity and its persistence (Docket No. 13, pp. 23-24 of 370). The ALJ considered that Plaintiff had a degenerative disc disease that could easily be expected to produce back and neck pain despite the contradictions between

Plaintiff's testimony and the documented limitations in standing, lifting and walking that Plaintiff argued were caused by the pain.  Further review of the record shows that the ALJ considered the available medical evidence that related particularly to the management of Plaintiff's pain.  In that regard, Dr. McCormick found that Plaintiff had some tenderness in his spine but generally, upon physical examination Plaintiff had full musculoskeletal strength and intact neurological and nerve functioning.  Although Plaintiff had a complete collapse of disc space, the course of treatment was conservative including medication therapy, physical therapy and/or chiropractic treatment (Docket No. 13, pp. 23, 24 of 370).

Dr. Obri used conservative treatment for back and neck pain.  The diagnostic evidence used to trace the source of atypical chest pain met with unremarkable results (Docket No. 13, p. 24 of 370).  For these reasons, the ALJ, while fully considering Plaintiff's subjective complaints of pain, discounted them in light of other evidence in the record as a whole and made reasonable conclusions as to the effect the purported limitations caused by pain had on Plaintiff's ability to do basic work.

In considering the factors in 20 C.F.R. §§ 404.1529 and 416.929, the ALJ considered that Plaintiff's activities of daily living were compatible with performing light work activity.  Daily, Plaintiff drove, cooked his meals, exercised, tended to his personal needs with minimal difficulty, watched television and spent time on the computer (Docket No. 13, p. 23 of 370).  When considering the duration, frequency, and intensity of Plaintiff's back and neck pain and other symptoms and precipitating and aggravating factors, the ALJ noted that Dr. Obri confirmed that the medication regimen was successful in relieving and eliminating Plaintiff's pain (Docket No. 13, pp. 241).

The Magistrate finds no error in the ALJ's evaluation of Plaintiff's subjective complaints of disabling pain.

**X. CONCLUSION**

For the foregoing reasons, the Magistrate recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   July 11, 2014

### XI.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.